IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION


CROWN   CASTLE   NG   ATLANTIC
LCC,

      **Plaintiff,**                            **CIVIL NO. 4:15CV93**

      v.

**CITY OF NEWPORT NEWS,**
      **Defendant.**

## ORDER AND OPINION

This matter comes before the Court on a three-count Complaint filed by Crown Castle NG Atlantic LLC ("Crown Castle") seeking declaratory judgment and injunctive relief against the City of Newport News ("City"). Compl., ECF No. 1. The parties' dispute concerns the terms and enforcement of a franchise agreement granting Crown Castle use of the public rights-of-way within the City of Newport News. On August 28, 2015, Crown Castle filed its Complaint alleging that the actions taken by the City to enforce its understanding of the franchise agreement: (1) Count I, violate the franchise agreement; (2) Count II, violate the Code of Virginia § 56-462(C); and (3) Count III, violate 47 U.S.C. § 253. The City filed its Answer on September 23, 2015 and cross-motions for summary judgment were fully briefed by the parties by May 9, 2016. After a hearing on the cross-motions for summary judgment, the Court determined there were material facts in dispute and therefore conducted a three-day bench trial from June 7, 2016 to June 9, 2016.

As a result of the testimony and evidence presented a trial, and for the reasons set forth herein, the Court **GRANTS** declaratory judgment in favor of Crown Castle on Counts I and II of

the Complaint. The Court does not reach Crown Castle's claims presented in Count III pursuant to *Bell Atlantic Maryland, Inc. v. Prince George's County, Maryland*, 212 F.3d 863 (4th Cir. 2000). Accordingly, the Court **FINDS** that: (1) the City's actions requiring Crown Castle to obtain zoning or building approval for its four Node installations beyond the Right-of-Way and Electrical Permits already acquired are in violation of the Franchise Agreement; and (2) the City's actions requiring Crown Castle to obtain zoning approval beyond the Right-of-Way and Electrical Permits already acquired are in violation of the Code of Virginia § 56-462(C).

## I.   JURISDICTION

The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Count III of Crown Castle's Complaint alleges a violation of the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Telecommunications Act"). Compl. at ¶¶ 69-74, ECF No. 1. The Court has supplemental jurisdiction over the state law claims found in Counts I and II of the Complaint because they relate to and form part of the same case or controversy arising from Count III. *See* 28 U.S.C. § 1367(a).

After trial had concluded and initial post-trial briefs were filed, the City, for the first time, presented an argument in its Post-Trial Reply Memorandum that the Court should dismiss Crown Castle's federal claim and thereafter decline to exercise supplemental jurisdiction over the remaining state law claims raised in Counts I and II of the Complaint. *See* Def.'s Post-Trial Reply at 12-14, ECF No. 51; Def.'s Reply to Sur-Reply, ECF No. 57. In support of this request, the City accurately contends that the Court has discretion under 28 U.S.C. § 1367(c) to decline supplemental jurisdiction over a claim if it "raises a novel or complex issue of state law" or "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(1), (3). The City also argues that the Fourth Circuit has demonstrated a strong preference

that state law issues, particularly those involving questions regarding land use and zoning, be resolved by state courts. *See Arrington v. City of Raleigh*, 369 F. App'x 420, 423-24 (4th Cir. 2010) (unpublished) ("[O]ur precedents evince a strong preference that state law issues be left to state courts in absence of diversity or federal question jurisdiction . . . . That is to say, although we have consistently acknowledged that district courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished . . . at the same time, we have taken heed of the Supreme Court's teaching . . . that a federal court *should consider and weigh in each case, and at every stage of the litigation*, the value of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.") (emphasis in original) (internal quotations and citations omitted); *Fralin & Waldron, Inc. v. City of Martinsville, Va.*, 493 F.2d 481, 482-83 (4th Cir. 1974) ("[T]he courts of Virginia have extensive familiarity and experience with . . . matters . . . [involving municipal zoning ordinances, the correct construction of local land use law, and the delineation of the proper scope and exercise of local administrative discretion], and we believe that they should have the initial opportunity to pass upon them.").

In contrast, Crown Castle contends that Fourth Circuit precedent requires the Court to resolve Crown Castle's state law claims before resolving its federal claim. *See Bell Atlantic Maryland, Inc. v. Prince George's County, Maryland*, 212 F.3d 863 (4th Cir. 2000). Crown Castle also asserts that declining to exercise supplemental jurisdiction would constitute an abuse of discretion at this stage in the litigation as significant resources have been expended by both the parties and the Court during discovery, summary judgment motions, trial, and post-trial

briefing. Finally, Crown Castle argues that the City waived this argument by waiting to raise it until after trial.

Although the "discretionary aspect to supplemental jurisdiction is waivable," *Doe by Fein v. D.C.*, 93 F.3d 861, 871 (D.C. Cir. 1996), the cases cited by Crown Castle supporting this proposition merely establish that an objection to discretionary supplemental jurisdiction may be waived on appeal if not brought before the district court.  At this point, the City has not waived any argument or objection related to supplemental jurisdiction before this Court; however, the Court dismisses the City's argument and chooses to exercise supplemental jurisdiction over the state law claims for the following reasons.

The Court has proper supplemental jurisdiction over the two state law claims asserted by Crown Castle under 28 U.S.C. § 1367(a). Both claims are related to and form part of the same controversy that provides this Court with original jurisdiction over this matter. The Court has discretion to decline to exercise proper supplemental jurisdiction if the claims "raise[] a novel or complex issue of state law," if the state law claims substantially predominate over the federal law claim over which the Court has original jurisdiction, if "the district court has dismissed all claims over which it has original jurisdiction," or "in exceptional circumstances, [where] there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). While "trail courts enjoy wide latitude in determining whether or not to retain jurisdiction over state law claims when all federal claims have been extinguished," the Court informs this discretionary decision by considering the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995); *see also Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 297 (4th Cir. 2003); *Semple v. City of Moundsville*, 195 F.3d 708, 714 (4th Cir. 1999).

This litigation has been pending before this Court for nearly one year and the parties and Court have expended substantial resources throughout the various stages of the litigation, including extensive discovery, fully briefed and argued cross-motions for summary judgment, a three-day bench trial, and post-trial briefing. The City's arguments unquestionably come late in the litigation and although Counts I and II may present novel or potentially complex issues of state law, the Court finds the well-established principles of contract law and statutory interpretation sufficient to guide its efforts in resolving the claims presented. In addition, Crown Castle's federal claim has not been extinguished and at least one underlying issue of federal policy appears to counsel against declining supplemental jurisdiction.

In *Bell Atlantic Maryland, Inc. v. Prince George's County, Maryland*, 212 F.3d 863 (4th Cir. 2000), the plaintiff challenged the validity of a Prince George County ordinance on numerous state and federal grounds, including 47 U.S.C. § 253—the same provision of the Telecommunications Act Crown Castle asserts is violated by the City in this matter. Without reaching any of the plaintiff's state law claims, the district court found that 47 U.S.C. § 253 preempted the Prince George County ordinance and granted judgment on the pleadings in favor of the plaintiff. *See Bell Atlantic*, 212 F.3d at 864-65. On review, the Fourth Circuit vacated the judgment and remanded the case. The Fourth Circuit explained that the district court erred by reaching the constitutional question of preemption under 47 U.S.C. § 253 before deciding state law questions that provided alternate bases for granting the plaintiff the relief it sought and that could have fully disposed of the case. *Id.* In particular, the Fourth Circuit noted that "courts should avoid deciding constitutional questions unless they are essential to the disposition of a case" and that "determining whether a federal statute preempts a state statute, is a constitutional question." *Id.* at 865.

The Fourth Circuit's ruling in *Bell Atlantic* is directly relevant to the instant action. Here, Crown Castle seeks declaratory judgment and injunctive relief under state law and 47 U.S.C. § 253. The state law claims, if resolved in Crown Castle's favor, provide alternate bases for granting Crown Castle the relief it seeks without reaching the constitutional question of preemption under 47 U.S.C. § 253. As a result, *Bell Atlantic*, as discussed, articulates a relevant federal policy that when applied to the instant action favors retention of supplemental jurisdiction over the state law claims raised by Crown Castle. In addition, many of the Fourth Circuit decisions favoring a district court's declination of supplemental jurisdiction are premised on the fact that all federal claims were dismissed. As already noted, the federal claim in this case has not been dismissed and the Court endeavors to follow the process and principles described in *Bell Atlantic*. If the Court initially declined to exercise jurisdiction over the state law claims or considered the federal claim before the state law claims, the Court's actions would in and of themselves violate *Bell Atlantic*.

After consideration of 28 U.S.C. § 1367(c), the convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy, the Court finds it appropriate to retain supplemental jurisdiction over Crown Castle's state law claims and consider them before reaching the constitutional question presented by 47 U.S.C. § 253.

## II.   FACTUAL FINDINGS

The parties stipulated to a number of relevant facts as set forth in the Final Pretrial Order entered by the Court on May 31, 2016. *See* Final Pretrial Order at 1-7, ECF No. 36. In addition to recounting relevant stipulated facts, the Court makes additional factual findings based on the evidence and testimony presented at trial.

### A.  The Parties

The City of Newport News is a municipal corporation that operates, in relevant part, under the direction of the City Council, City Mayor, and City Manager.

Crown Castle is a corporation that provides telecommunications services and does so in the Commonwealth of Virginia pursuant to a Certificate of Public Convenience and Necessity ("CPCN") issued by the Virginia State Corporation Commission ("Commission"). Stip. Facts at ¶¶ 1-2, ECF No. 36. The Commission originally granted Crown Castle, then known as NextG Networks Atlantic, Inc., a CPCN to furnish local exchange and interexchange telecommunication services on June 16, 2004. *Id.* at ¶ 2; Pl.'s Ex. 1. At some point thereafter, Crown Castle NG Atlantic Inc. became Crown Castle NG Atlantic LLC and on October 22, 2014 the Commission cancelled Crown Castle's existing CPCN and reissued it in the name of Crown Castle NG Atlantic LLC. Stip. Facts at ¶ 2; Pl.'s Ex. 1.

Although Crown Castle's service and network incorporates wireless reception devices, Crown Castle is not a wireless provider. Stip. Facts at ¶ 4. Instead, Crown Castle acts as an intermediary for wireless carriers—transporting carriers' communication signals between designated endpoints of the carriers' choosing. *Id.* at ¶¶ 3-4; Day 1 Trial Tr. 53:23-54:23. Crown Castle, under the CPCN, provides this telecommunications service by creating and using networks generally referred to as Distributed Antenna Systems ("DAS"). Stip. Facts at ¶ 3. Crown Castle's typical DAS consist of: (1) "Nodes," which are typically located on utility or streetlight poles in the public rights of way and consist of small, low-power antennas, lasers, and electronic equipment that convert Radio Frequency format communication to light signals; (2) fiber optic cables; (3) "Hubs," which are central locations typically located on private property and contain routers, switches, and signal conversion equipment; and (4) other equipment. *Id.*; *see*

*also* Day 1 Trial Tr. 58:20-59:13. The telecommunications service typically provided by Crown Castle allows carriers' to hand off communication signals to Crown Castle at either the Nodes or Hubs, at which point Crown Castle transports the communication signals to a distant point— typically another Crown Castle-operated Node or Hub. Stip. Facts at ¶ 3; Day 1 Trial Tr. 58:20-59:13. Thereafter, Crown Castle hands the communication signals back to the carrier. *See* Day 1 Trial Tr. 53:23-54:23; 58:20-59:13.

### B. The Parties' Negotiations for a Franchise Agreement

On December 11, 2012, Crown Castle's Director of Government Relations, at the time Mr. Christopher Sinclair, submitted a letter with attachments to the City Manager of Newport News, with courtesy copies to the City Attorney, City Clerk, and Director of Public Works, regarding "Formal Application to Access The Public Right of Way for the Provision of Telecommunications Services" ("Formal Application"). Stip. Facts at ¶ 5; Stip. Ex. 3; Day 1 Trial Tr. 59:23-66:21. The Formal Application submitted by Crown Castle included a request to access the public rights-of-way within the City of Newport News and guidance on the City's process for allowing Crown Castle to place and maintain communications facilities in the public way. Stip. Ex. 3 at CITY000196-97. The Formal Application also included a brief description of Crown Castle and its services. *Id.* Lastly, the application package contained three attachments, consisting of a reprint of an article entitled "Providing Wireless Coverage Where Towers Are Not Welcome," a "We Are Solutions: Local Officials Guide," and a copy of the CPCN issued by the Commission to Crown Castle. *See* Stip. Ex. 3; Day 1 Trial Tr. 60:13-19.

The letter and attachments included as part of the Formal Application are straightforward and speak for themselves. Among the relevant topics and descriptions contained in the application letter, Crown Castle noted its Nodes are "typically attached to existing infrastructure,

such as a utility distribution pole or street light pole, where available" and that deployment of its services "is not premised on the construction of new towers or monopoles." Stip. Ex. 3 at CITY000196. The Local Officials Guide, a thirteen-page document attached to the letter application, stated among many features that "Crown Castle will generally seek to collocate its facilities on existing utility or streetlight poles, typically located in the public rights of way," but that "if there is no available infrastructure, or if the Municipality does not wish to allow Crown Castle to attach to its streetlight or traffic signal poles, Crown Castle may need to install its own utility poles." Stip. Ex. 3 at CITY000193-94. This attachment to the letter application also indicated that if such a circumstance arises, "Crown Castle will comply with all lawful local regulations governing such installations." *Id.* It is important to note that this attachment and language contained therein was not incorporated into the Franchise Agreement which was subsequently executed by the City and the Plaintiff.

On January 15, 2013, Deputy City Attorney Joseph DuRant responded to Crown Castle's Formal Application by sending a letter and draft franchise agreement to Mr. Sinclair. Stip. Facts at ¶ 6; Stip. Ex. 10. Mr. DuRant's letter indicated that the draft franchise agreement was enclosed pursuant to Virginia Code §56-462 and that the draft "references the permitting section of the City Code and includes a hyperlink to the City's permitting application." Stip. Ex. 10. In order to expedite the application process, Mr. DuRant provided Crown Castle an editable electronic copy of the draft franchise agreement. *See* Stip. Ex. 77; Day 2 Trial Tr. 377:7-378:4. On April 30, 2013, Mr. Sinclair, acting on behalf of Crown Castle, sent Mr. DuRant proposed edits to the draft franchise agreement and a copy of "Exhibit A," which he proposed to be included as an exhibit to the franchise agreement. Stip. Facts at ¶ 7; Stip. Ex. 4. Among Crown Castle's edits to the draft franchise agreement was a lengthy addition to the first paragraph detailing the types of

equipment Crown Castle intended to deploy on the public rights of way and its intent to place equipment on facilities owned by Crown Castle or utility companies. *See* Stip. Ex. 4 at ¶ 1. In the second paragraph, Crown Castle added language indicating the City agreed, as prescribed in Virginia Code § 56-462(C)(ii), not to impose any requirements, fees, or processes regarding Crown Castle's use of public rights of way that are not functionally equivalent to the requirements, fees, or process imposed on other telecommunications services providers. *Id.* at ¶ 2. The attached Exhibit A included a number of depictions and descriptions of Crown Castle equipment that, as Mr. Sinclair explained at trial and as Exhibit A itself indicates, "are intended to be representative in nature" and "[a]ctual installations may differ somewhat [from the depictions and descriptions contained in Exhibit A] based upon various factors, including, but not limited to, the coverage and/or capacity objective, final equipment selection, field and pole conditions, existing pole attachments, utility construction standards, and future changes in technology." Stip. Ex. 4 at CC000206; *see also* Day 1 Trial Tr. 78:8-79:22.

Mr. DuRant responded to Mr. Sinclair's proposed edits on May 14, 2013. Stip. Facts at ¶ 7; Stip. Ex. 5. In its response, the City proposed deleting the web links to Chapter 38 of the Newport News City Code and the City's Department of Engineering website. Stip. Ex. 5 at CC000168; Day 1 Trial Tr. 81:17-22. In place of the deleted link to the Department of Engineering, the City added a commenting indicating that information regarding application for the right-of-way permit may be obtained "from the Permits Office of the City's Department of Engineering." Stip. Ex. 5 at CC000168. The City also deleted the language added to Paragraph 1 in Crown Castle's previous edit allowing Crown Castle to install equipment on facilities owned by utility companies. *Id.* As Mr. DuRant explained in his written comment, he believed the City could not "contract as to the rights of non-City owned utilities not a party to the franchise

[agreement]." *Id.* Finally, although the City made a number of additional comments and edits, the last edit relevant to this litigation was the City's proposal to strike the entirety of Crown Castle's additions to the final sentence of the second paragraph regarding Virginia Code §§ 56-462(C)(ii) and 56-458(D). *Id.* In explaining this proposed edit, Mr. DuRant indicated the language was "superfluous as the state law sets the standards"[1] and "the addition was unnecessary . . . because it essentially requoted the statutes involved."[2] In addition to the City's proposed edits and comments, Mr. DuRant attached "Exhibit B" to the draft franchise agreement, which detailed certain insurance requirements for permits, and requested a second copy of Exhibit A. Stip. Ex. 5. That same day, Mr. Sinclair provided Mr. DuRant with another copy of Exhibit A. *See* Stip. Facts at ¶ 7; Stip. Ex. 6; Day 1 Trial Tr. 83:8-14; Day 2 Trial Tr. 386:22-387:15.

Mr. Sinclair responded to the City's comments and edits in an itemized email on July 1, 2013. Stip. Facts at ¶7; Stip. Ex. 7. In relevant part, Mr. Sinclair's email requested to retain the language in Paragraph One regarding use of utility-owned facilities. Stip. Ex. 7 at CC000151. Mr. Sinclair also requested that the final sentence of Paragraph 2 regarding Virginia Code §§ 56-458 and 56-462 be retained "to avoid confusion in the future for individuals involved in the administration of the agreement." *Id.* On July 22, 2013, Mr. DuRant responded to Mr. Sinclair's suggested changes and accepted and incorporated the edits relevant to this case. Stip. Ex. 61; Day 2 Trial Tr. 397:6-398:5. Mr. Durant and Mr. Sinclair exchanged additional email communications regarding proposed changes to the draft franchise agreement. *See* Stip. Exs. 60, 62; Def. Ex. 3. These communications ultimately led to the finalization of a draft franchise agreement, with Exhibit A and Exhibit B attached, to be submitted to the City Council for

---

[1] Stip. Ex. 5 at CC000168.
[2] Day 2 Trial Tr. 386:14-16.

11

approval. Def. Ex. 3.

## C. The Franchise Agreement

At its public meeting on November 26, 2013, the City Council passed Ordinance No. 7014-13, granting Crown Castle a franchise agreement to construct, maintain and operate a telecommunications system in the City of Newport News, Virginia. Stip. Facts at ¶ 8; Stip. Ex. 89. In preparation for the public hearing, the City Council received a package containing, among other materials, an agenda for the meeting, the finalized franchise agreement and attached exhibits, and a memorandum from the City Manager dated November 20, 2013 regarding the proposed franchise agreement. Stip. Facts at ¶ 8; Stip. Ex. 15. A Crown Castle representative attended the public hearing in order to respond to any questions posed regarding the franchise agreement, though no questions or comments were directed to the representative by the City Council. Day 2 Trial Tr. 402:21-24; 416:22-417:3.

Subsequent to the City Council passing Ordinance No. 7014-13, Crown Castle and the City executed the Franchise Agreement For Use of Public Rights-of-Way In the City of Newport News, Virginia ("Franchise Agreement"), which became effective on December 17, 2013. Stip. Facts at ¶ 9; Stip. Ex. 9. The Franchise Agreement consists of the main agreement and attached Exhibits A and B. *Id.* The most relevant portions of the Franchise Agreement state the following:

This agreement ("Agreement") is made this 17th day of December, 2013, by and between Crown Castle NG Atlantic Inc., a Virginia corporation (formerly know as NextG Networks Atlantic, Inc.) (hereinafter referred to as the "User"), and the City of Newport News, Virginia (hereinafter referred to as the "City"), to establish the conditions for use of the City rights-of-way.

1. The City agrees to give the User, on a non-exclusive basis, whatever rights it has for the User to perform work in the City rights-of-way pursuant to each permit issued by the City Department of Engineering, pursuant to City Code Chapter 38, Article II, Divisions 2 and 3. The information regarding application for the right-of-way permit may be obtained from the Permits Office of the City's Department of Engineering. The User shall be responsible for obtaining the permission of any

12

other City, state, or federal government agency whose permission is required to work in the City's rights-of-way. Pursuant to Virginia Code Sections 56-458 and 56-462, the User intends to construct, install, maintain, and operate a fiber-based telecommunications network by locating, placing, attaching, installing, operating, maintaining, controlling, removing, reinstalling, relocating, and replacing equipment in the public rights-of-way on facilities owned by utility companies or the User. Such equipment shall consist of optical converters, power amplifiers, radios, DWDM and CWDM multiplexers, microcells, remote radioheads, antennas, fiber optic and coaxial cables, wires, meters, pedestals, power switches, and related equipment, whether referred to singly or collectively, to be installed and operated by the User hereunder. Examples of typical equipment types and installation configurations are shown in the drawings attached hereto as Exhibit A and incorporated herein by reference.

2. The User shall obtain a permit for each project in which work will be done in the City's rights-of-way. Issuance of each permit shall be based upon the City's review of plans indicating the work to be done. The User agrees to comply with all provisions of each permit and the project plans which have been reviewed by the City. Should the User discover conflicts or other conditions that prevent it from working as specified in the User's plans, the User shall notify the City Department of Engineering, and, if the User desires to continue said project, the User shall obtain any necessary private easement, at its own expense, should sufficient area for installation be unavailable in the City rights-of-way. The City agrees not to impose on the User any requirements, fees, or process regarding the use of the public rights-of-way that are not functionally equivalent to the requirements, fees, or process that are imposed on other providers of telecommunications services, as prescribed in Virginia Code Section 56-462(C)(ii), and to act upon any permit within forty-five (45) days of application, as required by Virginia Code Section 56-458(D).

…

5. The User shall resolve any conflict with existing utility facilities in the City rights-of-way at the time the User (i) installs its facilities and equipment or (ii) changes the use of its facilities and equipment within the City rights-of-way. The User shall abide by all local, state and federal law and regulations regarding location and protection of existing utilities.

Stip. Ex. 9 at CC000299-300.

The Franchise Agreement repeatedly tasks the City Department of Engineering with oversight over the permitting and compliance processes for Crown Castle's use of the rights-of-way. In addition to the process described in Paragraphs 1 and 2, Paragraph 6

states that Crown Castle "shall comply with all requirements imposed by each permit . . . required by the City Department of Engineering to insure repair of any damage caused by the User." *Id.* at 300. Paragraphs 8 and 9 indicate Crown Castle will be permitted to work in the rights-of-way during "the hours provided in the permit" and require Crown Castle to advise the City Department of Engineering if an emergency occurs. *Id.* In Paragraph 10, the Franchise Agreement allows the Department of Engineering to hold a pre-construction meeting with Crown Castle if specified in the permit and prohibits the Plaintiff from working in areas not covered by the permit unless otherwise approved by the Department of Engineering. *Id.* Finally, Paragraphs 11 and 19 of the agreement indicate that the Department of Engineering may modify certain relocation deadlines and should be served all notices given pursuant to the agreement. *Id.* at CC 000301-02.

### D. Crown Castle's Installations

In 2014, pursuant to the terms of the Franchise Agreement, Crown Castle applied for and was granted Right-of-Way Permits from the Department of Engineering and Electrical Permits from the City Department of Codes Compliance to install Node facilities at the following four locations in the City of Newport News: (1) Trailblazer Boulevard & Denbigh Boulevard ("Trailblazer/Denbigh"); (2) Beechmont Drive & Warwick Boulevard ("Beechmont/Warwick"); (3) Motoka Drive & Tillerson Drive ("Motoka/Tillerson"); and (4) Circuit Lane & Old Courthouse Way ("Circuit/Courthouse"). Stip. Facts at ¶ 11; Stip. Exs. 18-21; Stip. Exs. 73-76. The Right-of-Way Permits for the installations at Trailblazer/Denbigh, Beechmont/Warwick, and Motoka/Tillerson describe the work to be done as attaching telecommunications equipment to either Verizon- or Dominion Virginia Power- ("Dominion") owned wood utility poles. Stip. Exs. 18, 20-21. For the installation at Circuit/Courthouse, the Right-of-Way Permit describes the

work to be completed as placing "new 35' concrete utility pole and attach[ing] telecommunications equipment to new 35' concrete utility pole." Stip. Ex. 19. The Electrical Permits for all four installations describe the work as "ELECTRICAL SVC FOR TELECOM EQUIP ON STREET LIGHT POLE." Stip. Exs. 73, 75-76.

At the Node installations at Trailblazer/Denbigh and Motoka/Tillerson, Crown Castle attached its equipment to utility poles owned by Dominion. Stip. Facts at ¶ 14. The equipment attached at the Node installation at Beechmont/Warwick was attached to a utility pole owned by Verizon. *Id.* The Node installations at each of these three locations consist of a small drum-style antenna at the top of the utility pole, cabling, and an equipment shroud and battery back-up unit attached to a pole. Stip. Facts at ¶ 13. The antennas at each of Crown Castle's Nodes are 24"x10" outside diameter, the equipment shroud at each Node installation is 25"x12.4"x12.2" and the battery pack back-up unit at each is 32.125"x23"x13.5". *Id.*; *see also* Stip. Exs. 22-24 (photographs of the three installations).

As contemplated in the Rights-of-Way Permits, the existing utility poles owned by Dominion and Verizon were replaced to accommodate Crown Castle's equipment. Stip. Ex. 18 at CITY000299; Stip. Ex. 20 at CITY000337; Stip. Ex. 21 at CITY000368; Day 3 Trail Tr. 620:7-637:16. To initiate the Node installation process on poles owned by Dominion or Verizon, Crown Castle conducted a structural analysis of the poles and submitted a ticket, which contained its request to place equipment on the poles and a short description of its structural analysis, to a system that conveyed the request to the pole owners. Day 3 Trail Tr. 620:7-637:16; Stip. Ex. 11. Verizon and Dominion, as owners of the poles, controlled the pole replacement process and required the three poles to be replaced with taller and wider poles in order to comply with the National Electric Safety Code, as well as other applicable codes or company

15

preferences. *Id.*; *see also* Day 2 Trial Tr. 350:19-351:24. Dominion and Verizon performed the replacement themselves and continue to own the utility poles, Day 3 Trial Tr. 643:22-644:1; however, Crown Castle paid both companies for replacing the utility poles. Day 3 Trial Tr. 643:9-21; *see also* Stip. Exs. 12-14. Although counsel and witnesses sometimes refer to these replacement poles as "new poles" rather than "replacement poles" or "existing poles," the testimony and evidence at trial indicates that the City does not consider such replacements as "new poles." *See* Day 1 Trial Tr. 243:10-244:7; 250:14-18. Instead, these poles are more accurately understood as replacements of existing poles. The evidence at trial also clearly demonstrated that the City does not require zoning approval for the replacement of existing poles in the City owned by Dominion or Verizon. *See* Day 1 Trial Tr. 219:15-220:2; 236:7-14; 244:11-245:24; 246:2-7; Day 3 Trial Tr. 532:15-533:13.

Finally, at the Node installation on Circuit/Courthouse, Crown Castle constructed its own thirty-five foot concrete pole and attached the same equipment previously described to the newly constructed pole. Crown Castle indicates it built the pole because Dominion would not allow it to attach its equipment to any of the concrete light structures in the area, Day 2 Trial Tr. 301:2-16, and the nearest wooden utility pole and traffic signal were located 2,506 feet and 2,611 feet away, respectively. Day 2 Trial Tr. 441:7-442:9.

According to the City's zoning map, Stip. Ex. 114, Crown Castle's installations are located in areas zoned as follows: (1) Motoka/Tillerson is an area zoned single family residential; (2) Circuit/Courthouse is in a multi-family dwelling district; (3) Trailblazer/Denbigh is an area zoned commercial; and (4) Beechmont/Warwick is an area zoned commercial. Stip. Facts at ¶¶ 16-19.

The City Zoning Ordinance defines "local utilities," in relevant part, as "[e]lectrical

power, telephone, gas, water, sewer, cable TV and . . . telephone exchanges, switching, and transmitting equipment . . . ." Newport News City Code § 45-201. Local utilities are permitted uses in every zoning district in the City and do not require additional zoning approval or conditional use permits. *See id.* at § 45-402. The Court finds Crown Castle's telecommunications services fit within the Zoning Ordinance's definition of local utilities.

In contrast, at the time the Franchise Agreement was entered into and Crown Castle installed its Nodes, the Zoning Ordinance defined "communication tower/antenna" as:

> Any structure erected on a lot or attached to another structure that supports broadcast or receiving equipment of any frequency or electromagnetic wave, or any sytem of wires, poles, rods, reflecting discs or similar devices used for transmission or reception of electromagnetic waves. Television antennas for home reception, satellite dishes (1) meter or less in diameter, and amateur radio tower/antenna(s) shall not be deemed communication towers/antennas under this definition.

Newport News City Code § 45-201. A "communication tower/antenna" are conditional uses in some zoning areas, while they are not permitted under any circumstances in other zoning districts. *See id.* at § 45-402. The City interprets all of the four Node installations as "communication towers/antennas." Under this interpretation, the Nodes at Motoka/Tillerson and Circuit/Courthouse would not be permitted under any circumstances and the Nodes at Beechmont/Warwick and Trailblazer/Denbigh require a conditional use permit or must be attached to an existing pole and meet requirements contained in § 45-523 of the Zoning Ordinance. Despite the City's interpretation, there were no "towers" constructed or replaced— only "poles." A pole by any other name is still a pole.

It is interesting to note that the City Council is the final decision-maker of any zoning application and appeal; however, in the Franchise Agreement, it gave Crown Castle "whatever rights it has . . . to perform work in the City rights-of-way" and delegated its authority to approve

17

this work to the City Department of Engineers. Stip. Ex. 9 at CC000299. On behalf of the City, the Department of Engineers approved all four permit applications that listed exactly the work Crown Castle would perform in the rights-of-ways.

### E.  The City's Enforcement Actions Against Crown Castle

After the installations were completed in accordance to the permits issued by the City Department of Engineering and the City Department of Codes Compliance, in June 2015, the Manager of Government Relations for Crown Castle NG Atlantic LLC, Richard Rothrock, received a phone call from Christine Mignona, the City's Zoning Administrator. Day 2 Trial Tr. 297:11-22.  During the call, Ms. Mignona indicated she had issues with Crown Castle's four Node installations and arranged a meeting with Crown Castle personnel. *Id.* On approximately June 18, 2015, Mr. Rothrock, Ms. Mignona, and representatives from the City's Planning, Engineering, and Office of Law Departments met in Newport News. *Id.* At the meeting, the City indicated all four Node installations either required building permits or were not permitted under the City Zoning Ordinance. *Id.* at 297:23-298:1.

Two weeks later, Mr. Rothrock received another call from Ms. Mignona in which she indicated she felt all four Nodes were not permitted under the Zoning Ordinance and would be more appropriately located on private parcels, like other traditional towers located in the City. *Id.* at 298:2-12. On July 6, 2015, Ms. Mignona emailed a group within the City, including the City Attorney, and stated: "Here we go! I contacted Crown Castle last week and advised that none of the Four installations will be approved through zoning . . . . I need to stop them so none of them are energized. I will put stop work placards on them, Michael-can Dominion be called to stop them?" *Id.* at 267:21-268:3; Def. Ex. 41. That same day, Ms. Mignona also emailed a City resident and stated: "They know that zoning will not approve any of the four even though they

18

have permits through Engineering. A condemnation/stop work will be placed on all of them." *Id.* at 270:13-271:15; Pl. Ex. 31. The following day, July 7, 2015, Crown Castle received an email from Stacy Oakey of Dominion indicating that the City, through City Inspector Bill Beatty, requested that Dominion remove power supplies from the four Node installations. Stip. Facts at ¶ 21.

On July 22, 2015, legal counsel for Crown Castle sent a letter to Mr. DuRant explaining Crown Castle's position that its Node installations comply with the Franchise Agreement and that the City's assertions conflict with the Franchise Agreement and relevant law. Pl.'s Ex. 11. Subsequently, on July 23, 2015, Crown Castle received a letter dated July 20, 2015 from Deputy City Attorney Lynn Spratley asserting that Crown Castle is in breach of the Franchise Agreement for failure to comply with all state and local laws, which the City claims includes the Zoning Ordinance. Stip. Facts at ¶ 22. The letter also requested that Crown Castle remove its equipment. *Id.*; *see also* Stip. Ex. 17. As a result of the dispute between the parties, Crown Castle filed its Complaint on August 28, 2015. The parties have agreed to leave the Nodes as they are while litigation is pending—currently, all four Nodes are not activated to provide service.

### F. The City's Regulation of Relevant Entities in the Public Rights of Way

Throughout the City of Newport News, including in the zoning districts where Crown Castle's Node installations are located, Verizon Virginia (and its predecessors-in-interest), the cable television company (currently known as Cox, and its predecessors-in-interest), and the electric company (currently Dominion and its predecessors-in-interest)—have installed equipment on utility poles in the public rights of way. Stip. Facts at ¶ 23; *see also* Pl.'s Ex. 43. The equipment installed by Verizon, Dominion, and Cox is often similar in size and sometimes larger than the Crown Castle equipment attached at each of the four Node locations. Day 1 Trial

Tr. 170:15-171:14; 172:8-21; *see also* Pl.'s Exs. 38, 39, 96. The evidence presented at trial demonstrates that the City has not required Verizon, Cox, or Dominion to obtain zoning approval or conditional use permits in order to place their equipment on utility poles located in the City's public rights of way or replace the utility poles they already own. *See* Day 1 Trial Tr. 201:11-14; 201:23-204:16; 212:16-19; 219:15-224:20; 233:20-238:1; 243:2-7; 245:18-247:19; Day 3 Trial Tr. 576:10-17. Rather, Verizon, Cox, and Dominion are generally required to obtain Right-of-Way Permits from the City Department of Engineering. Day 1 Trial Tr. 245:18-247:19. Finally, evidence was presented that antennas differing from the Crown Castle antennas were installed by the City on street light poles in the City's public rights of way but were not required to obtain zoning approval. Day 1 Trial Tr. 174:8-178:25; Pl.'s Exs. 42, 106; Pl.'s Ex. 43 (City Answer to Interrogatory 11).

## III.   COUNT I: THE FRANCHISE AGREEMENT

At its public meeting on November 26, 2013, the City Council passed Ordinance No. 7014-13, granting Crown Castle a franchise agreement to construct, maintain and operate a telecommunications system in the City of Newport News, Virginia. Stip. Facts at ¶ 8; Stip. Ex. 89. The Franchise Agreement was subsequently executed by the parties, effective December 17, 2013, and has the authority and effect of law. The Newport News City Code, adopted in 1978 and subsequently amended at various points in time, indicates that "[n]othing in this Code or the ordinance adopting this Code shall affect . . . (2) [a]ny ordinance granting any franchise or right . . . and all such ordinances are hereby recognized as continuing in full force and effect to the same extent as if set out at length in this Code." [3] Newport News City Code § 1-5. In addition,

---

[3] The City argues that Section 1-5 of the Newport News City Code was intended to prevent the repeal of ordinances granting franchise agreements that pre-existed the codification of the Code in 1978. The plain language of Section 1-5 and its subsequent amendments demonstrate that the section acts as more than a grandfathering provision for pre-existing laws; instead, it applies to "any" ordinance granting "any" franchise or right—without regard to when the

the Ordinance and Franchise Agreements make clear that the Franchise Agreement itself embodies the entirety of the requirements and conditions placed on Crown Castle to perform work in the City rights-of-way. The Ordinance passed by the City Council granting Crown Castle its franchise states that the agreement "sets forth conditions accompanying the grant . . . provides for regulations and use of the system; [and] prescribes penalties for violation of the provisions therein." Stip. Ex. 89 at CITY 000236. The Franchise Agreement itself is entitled "Franchise Agreement For Use of Public Rights-of-Way in the City of Newport News, Virginia" and the introductory paragraph of the Franchise Agreement itself indicates that the agreement was made "to establish the conditions for use of the City rights-of-way." Stip. Ex. 9. at CC000299. As a result, the terms and conditions contained in the Franchise Agreement control.

Under Virginia law, "[i]t is a well-established principle that, when a contract is clear and unambiguous, it is the duty of the court, and not the jury, to decide its meaning." *Misso Servs. Corp. v. AT&T Commc'ns, Inc.*, 39 F.3d 1177 (4th Cir. 1994) (internal quotations omitted) (quoting *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 194 (Va. 1984)). In addition, where "'an agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. This is so because the writing is the repository of the final agreement of the parties.'" *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir. 1998) (quoting *Lerner v. Gudelsky Co.*, 230 Va. 124, 334 S.E.2d 579, 584 (1985)). Virginia law "strictly adheres to the 'plain meaning' rule, entitling the parties to rely on the express terms of the written agreement." *Id.* When the language [of a contract] is plain and unambiguous, this Court must give effect to the plain meaning of that language." *Blue Cross of Sw. Virginia & Blue Shield of Sw. Virginia v. McDevitt & St. Co.*, 234 Va. 191, 195,

---

ordinance came into effect. Although Section 1-5 recognizes ordinances as "continuing," that alone does not inherently mean that Section 1-5 was intended to apply solely to ordinances pre-existing the enactment of Section 1-5.

360 S.E.2d 825, 827 (1987) (citing *Amos v. Coffey*, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984)). "Words used by the parties are normally given their usual, ordinary, and popular meaning" and "[n]o word or clause will be treated as meaningless if a reasonable meaning can be given to it." *Winn v. Aleda Const. Co.*, 227 Va. 304, 307, 315 S.E.2d 193, 194–95 (1984) (citing *Ames v. American Nat. Bank,* 163 Va. 1, 39, 176 S.E. 204, 217 (1934)).

In contrast, when a "material term or provision is ambiguous . . . extrinsic or parol evidence may be relevant to resolve the ambiguity." *Nw. Airlines, Inc. v. Metro. Washington Airports Auth.*, 924 F. Supp. 704, 708 (E.D. Va. 1996) (citing *Anden Group v. Leesburg Joint Venture,* 237 Va. 453, 377 S.E.2d 452 (1989)). However, "extrinsic evidence is admissible to supplement or explain a contract only when it is consistent with the express terms of the contract." *Cont'l Ins. Co. v. City of Virginia Beach*, 908 F. Supp. 341, 348 (E.D. Va. 1995). Contract language is ambiguous "when it may be understood in more than one way or when it refers to two or more things at the same time." *Pac. Ins. Co.*, 148 F.3d at 405 (4th Cir. 1998) (citing *Granite State Ins. Co. v. Bottoms,* 243 Va. 228, 415 S.E.2d 131, 134 (1992)).

Finally, as the Franchise Agreement was granted by a municipal corporation, both parties refer extensively to the principles expounded in McQuillin: The Law of Municipal Corporations. In particular, the City notes that "[f]ranchises granted by municipal corporations . . . are strictly construed, and if the terms of the franchise are doubtful and susceptible of two or more constructions, they are to be construed strictly against the grantee and liberally in favor of the public." 12 McQuillin Mun. Corp. § 34:62 (3d ed.). In addition, franchises should be "construed in harmony with the constitution and laws" when possible and be "just and reasonable." *Id.* "The rule that public grants are to be construed strictly against the grantee means simply that nothing shall pass by implication except it be necessary to carry into effect the obvious intent of the

grant." *Id.* Lastly, a "grant to use the streets is not to be frittered away by construction. It is to be held up by the four corners and examined and given a fair construction, i.e., a reasonable construction consistent with common sense." *Id.*

With the foregoing laws and principles in mind, the Court endeavors to determine whether the Franchise Agreement subjects Crown Castle to the City's Zoning Ordinance and therefore requires zoning approval, as asserted by the City. As discussed, the Franchise Agreement sets forth the conditions for Crown Castle to perform work in the City's rights-of-way. To this end, Paragraphs 1 and 2 identify the sole process Crown Castle must undertake in order to perform work in the City right-of-ways. In relevant part, Paragraphs 1 and 2 provide:

> 1. The City agrees to give the User, on a non-exclusive basis, whatever rights it has for the User to perform work in the City rights-of-way pursuant to each permit issued by the City Department of Engineering, pursuant to City Code Chapter 38, Article II, Divisions 2 and 3. The information regarding application for the right-of-way permit may be obtained from the Permits Office of the City's Department of Engineering. The User shall be responsible for obtaining the permission of any other City, state, or federal government agency whose permission is required to work in the City's rights-of-way . . . .

> 2. The User shall obtain a permit for each project in which work will be done in the City's rights-of-way. Issuance of each permit shall be based upon the City's review of plans indicating the work to be done. The User agrees to comply with all provisions of each permit and the project plans which have been reviewed by the City. Should the User discover conflicts or other conditions that prevent it from working as specified in the User's plans, the User shall notify the City Department of Engineering, and, if the User desires to continue said project, the User shall obtain any necessary private easement, at its own expense, should sufficient area for installation be unavailable in the City rights-of-way. . . .

*Id.* The City Code provisions referenced in Paragraph 1 describe, among other things, processes for obtaining permits to construct in and occupy the public rights of way. For example: Section 38-47 requires a person or company to obtain a permit from the director of engineering or the director's authorized representative before performing work in a right-of-way; Section 38-49 requires the application to be filed with the office of the

director of engineering; and Section 38-50 again requires persons or corporations to file an application for a permit to the director of engineering and describes duties of the director of engineering, including ensuring the work to be done complies with prevailing planning practices, zoning requirements, and other standards and ordinances.

Paragraphs 1 and 2 of the Franchise Agreement express the entirety of the relevant permitting requirements placed on Crown Castle in order to perform work in the City rights-of-way. The plain language of these paragraphs, and the Franchise Agreement as a whole, is devoid of reference to or contemplation of Crown Castle seeking City zoning approval or being subject to zoning requirements not embodied or incorporated into the text of the agreement. The Franchise Agreement identifies a single permit that is required for each project, obtained from the City Department of Engineering, and a single permitting process to be undertaken before the City Department of Engineering. As set forth in the Franchise Agreement, in order to perform work in the City right-of-ways, Crown Castle must obtain a permit for each project from the City Department of Engineering. Such a permit is to be applied for at the Department of Engineering and that same Department issues the permit pursuant to Chapter 38, Article II, Divisions 2 and 3 of the City Code. The permit is based on the City's review of the application and work to be performed and Crown Castle agrees to perform work pursuant to each permit issued by the City Department of Engineering. Crown Castle further agrees to comply with all provisions of the permit and project plans. If a conflict arises that prevents Crown Castle from completing its work, Crown Castle is to notify the City Department of Engineering.

Throughout the Franchise Agreement and the provisions it references, the Department of Engineering is tasked with oversight over the permitting and compliance

processes. *See* Stip. Ex. 9 at ¶ 1-2, 6, 8-11, 19. The Franchise Agreement does not specifically identify or require the approval of other City departments, including the Planning Department or Department of Codes Compliance, and makes no reference to any zoning requirements. Despite the lack of any specific reference to or requirement regarding zoning approval, the City argues that the Zoning Ordinance is an underlying condition of the Franchise Agreement because the agreement indicates Crown Castle is responsible for obtaining "the permission of any other City, state, or federal government agency whose permission is required to work in the City's rights-of-way."[4] *Id.* at ¶ 1. This sentence directly follows the first two sentences in Paragraph 1 in which the City gives Crown Castle "whatever rights it has for the User to perform work in the City rights-of-way" pursuant to permits issued by the Department of Engineering and further specifies that information regarding application for these permits can be obtained from the Permits Office of the City's Department of Engineering. The Franchise Agreement also does not identify any other City agency whose permission might be required to work in the City rights-of-way and the evidence presented at trial further demonstrates that the Department of Engineering alone is responsible for issuing Right-of-Way permits to work in the City rights-of-way. The Planning Department and Department of Codes Compliance do not issue permits to perform work in the public rights-of-way. Even if they did, as already noted, the City Council is the final decision-maker on zoning issues and it already provided Crown Castle with whatever rights it has for performing work in

---

[4] The City has also pointed to Paragraph 5 of the Franchise Agreement to support its argument that the Zoning Ordinance is an underlying condition of the Franchise Agreement. The Court finds this argument unpersuasive as Paragraph 5 refers exclusively to conflicts with existing utility facilities and requires Crown Castle to "abide by all local, state and federal law and regulations *regarding location and protection of existing facilities*." Stip. Ex. 9 at ¶ 5 (emphasis added). Paragraph 5 does not have relevance to any potential conflicts with zoning requirements or zoning approval.

the rights-of-way. Ultimately, the plain language of the Franchise Agreement establishes "conditions for use of the City rights-of-way" that includes seeking, obtaining, and performing work pursuant to a permit from the Department of Engineering; but the language does not include conditions regarding zoning requirements or approvals.

Finally, Paragraph 2 of the Franchise Agreement indicates that the City agrees to treat Crown Castle like other providers of telecommunications services, as prescribed in Virginia Code Section 56-462(C)(ii). The evidence and testimony presented at trial demonstrated that the City has not required other telecommunications, cable television, or electric providers to obtain zoning approval when replacing utility poles or attaching equipment to utility poles—rather, these companies have only been required to obtain Right-of-Way permits from the Department of Engineering.

Although the Court does not find any ambiguity in the contract entered into by the City and Crown Castle, and as exemplified in the Ordinance passed by the City Council, to the extent that any ambiguity exists within the terms of the Franchise Agreement regarding zoning requirements and approval, the parties' communications support the notion that they did not intend for the Zoning Ordinance to apply to Crown Castle's rights-of-way use. The parties' communications regarding the draft franchise agreement extended over a significant period of time and included extensive edits and comments concerning the paragraphs governing permitting approval and subsequent work at the rights-of-way. Although the City was aware at an early stage of the equipment Crown Castle intended to deploy, the parties' communications never discussed any zoning requirements or Planning Department approvals. In addition, the City Attorney, City Manager, and Director of Engineering were made aware of the initial communications

and at least one subsequent markup between the City and Crown Castle; however, the City Planning Department was not. Accordingly, the parties' communications demonstrate that they did not contemplate or intend zoning requirements as part of the Franchise Agreement.

For the reasons set forth above, the Court finds that the Franchise Agreement does not subject Crown Castle to the Zoning Ordinance or zoning approval; accordingly, the City's actions to require Crown Castle to comply with the Zoning Ordinance and either remove its equipment, comply with conditions described in § 45-523 of the City Code, or obtain conditional use permits are in violation of the Franchise Agreement. However, even if the Franchise Agreement did subject Crown Castle to the Zoning Ordinance, the requirements and restrictions the City seeks to impose would be inappropriate as Crown Castle's services fit within the Zoning Ordinance's definition of "local utilities." For zoning purposes, "local utilities" are defined as "[e]lectrical power, telephone, gas, water, sewer, cable TV and . . . telephone exchanges, switching, and transmitting equipment . . . ." Newport News City Code § 45-201. These local utilities are permitted uses in every zoning district in the City and do not require additional zoning approval or conditional use permits. *See id.* at § 45-402. In addition, the Virginia Construction Code exempts the Crown Castle equipment in § 102.3(1).

## IV.    COUNT II: CODE OF VIRGINIA § 56-462(C)

In Count II of the Complaint, Crown Castle claims that the City is in violation of Section 56-462(C)(ii) of the Virginia Code. Within Title 56 of the Code of Virginia, which concerns Public Service Companies, Section 56-462(C) is found under Chapter 15 (Telegraph and Telephone Companies), Article 1 (Erection of Lines; Rights-of-Way; Eminent Domain, Etc.). Section 56-

462(C) provides:

> *No locality* or the Department of Transportation *shall impose on certificated providers of telecommunications service*, whether by franchise, ordinance or other means, *any restrictions or requirements concerning the use of the public rights-of-way* (including but not limited to the permitting process; notice, time and location of excavations and repair work; enforcement of the statewide building code; and inspections), which are (i) unfair or unreasonable or (ii) *any greater than those imposed on the following users of the public rights-of-way: all providers of telecommunications services and nonpublic providers of cable television, electric, natural gas, water and sanitary sewer services.* For purposes of this subsection, "restrictions or requirements concerning the use of the public rights-of-way" shall not include any existing franchise fee or the Public Rights-of-Way Use Fee.

Va. Code § 56-462(C) (emphasis added). It is undisputed that § 56-462(C) applies to Crown Castle's installations and the requirements the City seeks to impose through the Franchise Agreement and Zoning Ordinance.[5] Additionally, the Franchise Agreement explicitly references § 56-462(C) and both parties acknowledge that Crown Castle is a certificated provider of telecommunications service under the provision, as Crown Castle has held a CPCN from the Virginia Corporation Commission since 2004.

The primary issues in dispute under § 56-462(C) arise from the City's attempt to apply the City Zoning Ordinance, and its associated restrictions and requirements, to Crown Castle's installations in the rights-of-way. The City asserts that (1) the Zoning Ordinance applies to Crown Castle's installations and (2) that all of Crown Castle's Node installations fit within the Zoning Ordinance definition of a "communication tower/antenna" and are therefore subject to further restrictions and requirements—ranging from a complete bar on placing its equipment in certain zoning districts to obtaining conditional use permits for installations in other zoning districts. Crown Castle

---

[5] For example, the City Manager's report, provided to the City Council in anticipation of the public hearing regarding the Franchise Agreement, states that "[s]uch installations fall under . . . Title 56, Public Service Companies, Chapter 15, Telegraph and Telephone Companies, of the *Code of Virginia*." Stip. Ex. 15 at CC000406.

argues compliance with the Zoning Ordinance and additional restrictions and requirements contained therein for "communication towers/antennas" amounts to far greater and more burdensome restrictions than those the City imposes on the other specified users of the public rights-of-way. Crown Caslte further contends no other rights-of-way user described in § 56-462(C) has been required to obtain any approval under the Zoning Ordinance in order to install equipment on utility poles in the public rights-of-way. In response, the City asserts the requirements it seeks to apply to Crown Castle apply to all rights-of-way users whose equipment falls within the definition of "communication tower/antenna" under the Zoning Ordinance; however, the testimony and evidence presented at trial did not identify any other rights-of-way users who employ equipment that is subject to the same or similar requirements.

Although § 56-462(C) has never been construed by Virginia courts, the plain language of the statute is broad and unambiguous. The City cannot impose requirements or restrictions concerning the use of the public rights-of-way on Crown Castle that are any greater than those imposed on "all providers of telecommunications services and nonpublic providers of cable television, electric, natural gas, water and sanitary sewer services." Despite the differing technologies and services provided by these specified providers, each requiring varying types of equipment to be deployed in the rights-of-way, § 56-462(C) groups these rights-of-way users together and requires the City to only impose restrictions or requirements on certificated providers of telecommunications services that are no greater than those imposed on the rest of the group. The statute does not require the restrictions or requirements to be exactly the same, but it does require them to be equal; that is, no greater than those imposed on the other specified providers.

29

At its core, the issue presented by the parties' contentions is whether § 56-462(C) allows the City to impose greater requirements or restrictions concerning the use of the public rights-of-way on a certificated provider of telecommunications services based on the type of equipment or technology it deploys. While facially the requirements and restrictions at issue apply to all rights-of-way users who install "communication towers/antennas" in the public rights-of-way, in application the only rights-of-way user deploying equipment subject to these restrictions is Crown Castle. It is evident from the language of the statute that § 56-462(C) requires the City not to impose greater requirements or restriction on certificated telecommunications providers than those it imposes on companies providing different services and using very different equipment. The statute does not allow the City to single out a certificated provider of telecommunications services for more burdensome treatment based solely on the unique equipment or technology it uses. Rather, the restrictions and requirements imposed on the provider of telecommunications services must not be greater than those imposed on the other specified users of the public rights-of-way.

Here, the City asserts that Crown Castle must comply with the City Zoning Ordinance as a condition of access to the public rights-of-way. As previously noted, because the City deems Crown Castle's equipment to fall within the Zoning Ordinance's definition of "communication tower/antenna," Crown Castle would either be: (1) entirely excluded from placing its equipment in certain zoning areas; (2) required to comply with seven conditions described in § 45-523, which are subject to discretionary determinations by the Zoning Administrator, in order to attach its equipment to existing structures; or (3) required to apply for and obtain conditional use permits for its installations in other

zoning areas. The process for obtaining a conditional use permit under the Zoning Ordinance would require Crown Castle to submit detailed materials under § 45-523 and § 45-2703 of the Zoning Ordinance, meet numerous requirements regarding minimum setbacks, appearance, and screening as set forth in § 45-523, and go through meetings with the Planning Department staff and hearings before the Planning Commission and City Council. In addition, the City Council can only approve the application if it satisfies a number of additional standards described in § 45-2702 that are largely subjective and discretionary.

While the City asserts that these restrictions apply to all rights-of-way users who install equipment deemed as "communication towers/antennas," the trial testimony and evidence demonstrated that Crown Castle is the only user specified in § 56-462(C) whose equipment meets this definition. In addition, the testimony and evidence presented at trial did not identify any equipment or technology employed by the other specified users that is subject to restrictions and requirements at all similar to those imposed on Crown Castle. Verizon, Cox, and Dominion, rights-of-ways users who fall within § 56-462(C)'s list of relevant specified users, have all installed equipment on utility poles in the public rights-of-way throughout the City, including in the zoning districts occupied by Crown Castle's facilities. Stip. Facts at ¶ 23. Although the equipment differs in function, the equipment installed by Verizon, Dominion, and Cox is often similar in size and sometimes larger than the equipment attached at each of Crown Castle's four Node locations. Day 1 Trial Tr. 170:15-171:14; 172:8-21; *see also* Pl.'s Exs. 38, 39, 96. The facts established at trial demonstrated that the City classifies Verizon, Cox, and Dominion as local utilities and therefore does not require these companies to obtain any

31

approval under the Zoning Ordinance in order to install equipment on utility poles in the public rights-of-way.[6] *See* Day 1 Trial Tr. 201:11-204:16; 233:7- 238:2; 246:10-247:19. Instead, these companies are generally required to obtain Rights-of-Way permits from the Department of Engineering—the same permitting requirement Crown Castle must undertake under the terms of the Franchise Agreement. *Id.* The City argues that Crown Castle is different because the utility poles needed to be replaced in order for it to install three of its Nodes in the City; however, the evidence at trial demonstrated that the City does not require Dominion and Verizon, owners of existing utility poles, to obtain zoning approval before replacing poles to accommodate their own equipment. *See* Day 1 Trial Tr. 219:15-220:2; 236:7-14; 244:11-245:24; 246:2-7; Day 3 Trial Tr. 532:15-533:13.

The City's attempts to require Crown Castle to comply with the restrictions and requirements found in the Zoning Ordinance for "communication towers/antennas" violates the Code of Virginia § 56-462(C). Crown Castle is a certificated provider of telecommunications services and the restrictions and requirements the City seeks to impose are undoubtedly greater than those it imposes on "all providers of telecommunications services and nonpublic providers of cable television, electric, natural gas, water and sanitary sewer services." Accordingly, the Court finds the City in violation of the Code of Virginia § 56-462(C).

## V. COUNT III: 47 U.S.C. § 253

Because both state law claims have been resolved in Crown Castle's favor and each provides an alternate basis for granting Crown Castle the relief it seeks, the Court does not reach the constitutional question of preemption arising from Crown Castle's claim under 47 U.S.C. §

---

[6] As previously indicated, the Court finds Crown Castle's services also fall within the definition of "local utilities" as defined in § 45-201 of the Newport News City Code.

253. *See Bell Atlantic*, 212 F.3d at 864-65.

## VI.    INJUNCTIVE RELIEF

In its Complaint, Crown Castle seeks an injunction "enjoining the City, through its officers and agents, from taking any action to prevent, delay, or remove Crown Castle's node installations in the rights of way." Compl. at ¶ 74(b), ECF No. 1. In order to be granted permanent injunctive relief, Crown Castle must demonstrate the following four elements: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Ebay Inc. v. Mercexchange, L.L.C.,* 547 U.S. 388, 391 (2006); *see also Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007). "Moreover, the [Supreme] Court [has] reiterated that even upon this showing, whether to grant the injunction still remains in the 'equitable discretion' of the court." *Christopher Phelps & Associates*, 492 F.3d at 543.

In order to determine whether Crown Castle's request for an injunction should be granted, the Court **ORDERS** the parties to file their respective arguments on the issue within twenty-one (21) days of this Order. Reply briefs, if any, should be filed no more than seven (7) days after the initial twenty-one (21) day briefing period has expired.

## VII.    CONCLUSION

The City must be commended for its efforts to accommodate a complaint from a citizen which brought about this attempt to repudiate its prior actions; however, for the reasons stated, the Court **GRANTS** declaratory judgment in favor of Crown Castle on Counts I and II of the Complaint. The Court does not reach the claims presented in Count III pursuant to *Bell Atlantic*

*Maryland, Inc. v. Prince George's County, Maryland*, 212 F.3d 863 (4th Cir. 2000). Accordingly, the Court **FINDS** that: (1) the City's actions requiring Crown Castle to obtain zoning or building approval for its four Node installations beyond the Right-of-Way and Electrical Permits it already acquired are in violation of the Franchise Agreement; and (2) the City's actions requiring Crown Castle to obtain zoning approval beyond the Right-of-Way and Electrical Permits it already acquired are in violation of the Code of Virginia § 56-462(C).

The Court **ORDERS** the parties to file their respective arguments regarding the appropriateness of injunctive relief, including a discussion of the proper persons or entities to be enjoined, within twenty-one (21) days of this Order. Reply briefs, if any, should be filed no more than seven (7) days after the initial twenty-one (21) day briefing period has expired.

The Clerk is **DIRECTED** to forward a copy of this Opinion to all Counsel of Record.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE

Newport News, VA
August ___, 2016